**INTERNATIONAL HOUSING LIMITED, Plaintiff–Appellant–Cross–Appellee,**

v.

**RAFIDAIN BANK IRAQ, Defendant–Appellee–Cross–Appellant.**

**Nos. 239, 356, Dockets 89–7572, 89–7590.**

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1989.

Decided Dec. 22, 1989.

sion concluding that the district court had subject matter jurisdiction under the commercial activity exception in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2). We agree with Rafidain that the district court lacked subject matter jurisdiction and reverse on the cross-appeal. The appeal is dismissed as moot.

Edwin G. Schallert, New York City (Robert B. von Mehren, Debevoise & Plimpton, New York City; Douglas S. Eakeley, Riker, Danzig, Scherer & Hyland, Morristown, N.J., of counsel), for plaintiff-appellant-cross-appellee.

Charles E. Dorkey, III, New York City (Stephen H. Plum, IV, Richards & O'Neil, New York City of counsel), for defendant-appellee-cross-appellant.

Before KAUFMAN, MESKILL and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Plaintiff-appellant International Housing Limited ("IHL") commenced this action to enforce a default judgment entered against defendant-appellee Rafidain Bank Iraq ("Rafidain") in the Commonwealth of the Bahamas. IHL is a corporation organized in the Cayman Islands and has its principal place of business in Nassau, the Bahamas. Rafidain is a banking corporation wholly owned by the government of Iraq. Rafidain does not maintain a branch or office of any sort in the United States, has no employees or real property in the United States, does not advertise in the United States, and is not licensed to do business in the United States. Rafidain does, however, maintain a "correspondent" bank account with the Irving Trust Company in New York City. This account is similar to a personal checking account used for deposits, payments and transfers of funds.

IHL appeals from Judge Ward's decision dismissing this action for lack of personal jurisdiction. *See International Housing, Ltd. v. Rafidain Bank Iraq*, 712 F.Supp. 1112 (S.D.N.Y.1989). Defendant Rafidain cross-appeals from the portion of the deci-

## BACKGROUND

In 1975, IHL, through its wholly-owned subsidiary International Housing (Bahamas) Ltd., contracted with the Governorate of Diyala Province, Iraq, a division of the Iraqi government, to construct 740 housing units in Iraq. The contract fixed a price in Iraqi dinars that exceeded $5 million. The IHL officer who signed the contract was a United States citizen who worked in an IHL office in Connecticut, and IHL apparently used some American-made materials and American personnel on the project. However, the contract between IHL and the Governorate did not provide for payment or any other activity in the United States.

For this contract, the Iraqi Governorate used Rafidain as its commercial bank, while IHL used the Royal Bank of Canada. Rafidain secured an advance payment to IHL and issued a guarantee for IHL's performance. IHL obtained corresponding counter-guarantees from Royal Bank and agreed to indemnify Royal Bank for any payments it might have to make on these counter-guarantees. In addition, during the construction project, Rafidain issued to IHL "overdraft facility" credit—credit over and above the original guarantee—and IHL again guaranteed any resulting indebtedness to Rafidain through Royal Bank. In 1976 and 1977, IHL, Rafidain and Royal Bank entered into and issued six overdraft facilities with corresponding guarantees totalling more than $1 million.

IHL claims that in the course of the construction project the Governorate breached numerous material contract terms and that IHL was forced to utilize Rafidain's overdraft credit because of

those breaches. According to IHL, the construction was finished in 1978, but the Governorate refused to pay IHL in accordance with the contract. Political upheaval in Iraq and the Iraq–Iran war then intervened, and the Governorate's successor ultimately repudiated any obligation to IHL. Whatever the reasons for IHL's need to borrow money to complete the project, the parties do not dispute that IHL did use the overdraft credit from Rafidain that IHL had guaranteed through Royal Bank of Canada. In 1980, Rafidain requested that Royal Bank honor its guarantees on those overdraft facilities and deposit the funds in Rafidain's correspondent account at Irving Trust Company in New York City.[1] Royal Bank did honor the first two of Rafidain's requests and made payments to Rafidain totalling over $200,000, debiting the amounts to IHL's accounts with Royal Bank.

In 1981, IHL brought suit against Rafidain and Royal Bank in the New York Supreme Court seeking, inter alia, to enjoin further payment by Royal Bank on the remaining guarantees. The New York action was dismissed on forum non conveniens grounds, and IHL then sued Royal Bank and Rafidain in the Bahamas alleging that Rafidain's demands upon Royal Bank for payment were fraudulent and untimely under the guarantees. The Bahamian court initially enjoined Royal Bank from making further payments on the overdraft guarantees. That injunction eventually was dissolved because an adequate remedy at law existed, and Royal Bank paid Rafidain on the remaining overdraft guarantees. IHL eventually paid Royal Bank $850,000 in settlement of the bank's demand for indemnification. Rafidain never appeared in the Bahamian action, and IHL obtained a default judgment against Rafidain for $850,000.

In 1987, IHL commenced this action to enforce the Bahamian judgment against Rafidain. Rafidain failed to appear, and the district court entered a default judg-

ment against Rafidain and ordered recovery of the judgment via garnishment of Rafidain's account at Irving Trust. Rafidain then moved to vacate the default judgment on the grounds that the judgment was void because the district court lacked subject matter jurisdiction and personal jurisdiction over Rafidain. The district court found subject matter jurisdiction but concluded that Rafidain did not have sufficient contacts with the United States to support a constitutional exercise of personal jurisdiction. The court vacated the default judgment and dismissed the action for lack of personal jurisdiction. We reverse on the cross-appeal on the ground that subject matter jurisdiction is lacking. IHL's appeal then becomes moot.

## DISCUSSION

The FSIA, 28 U.S.C. § 1330 *et seq.*, governs both subject matter and personal jurisdiction over foreign states. The FSIA provides that foreign states are immune from suit in federal courts unless the dispute falls within specified exceptions to immunity. 28 U.S.C. §§ 1604–1607. The parties do not dispute that Rafidain is an "agency or instrumentality of the foreign state" as defined in 28 U.S.C. § 1603 and, as such, is entitled to immunity unless one of the statutory exceptions is applicable. The question presented is whether the instant dispute falls within the "commercial activities" exception to immunity found in 28 U.S.C. § 1605(a)(2).

Section 1605(a)(2) provides that a foreign state shall not be immune from jurisdiction in any case "in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of a foreign state elsewhere and that act causes a direct effect in the United States." Because Rafidain's activities were quintessentially "commercial," *see* 28 U.S.C. § 1603(d); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308–10 (2d Cir.1981),

---

1. IHL alleges that in 1979 Rafidain made wrongful demands on Royal Bank for payment on the advance payment and performance counter-guarantees. Although no payment was made on those demands, Rafidain apparently seized IHL assets in Iraq in 1980. 712 F.Supp. 1113.

*cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), and took place outside the United States, the issue with regard to subject matter jurisdiction is whether Rafidain's activities "had a direct effect in the United States." *See* 712 F.Supp. at 1115. The district court concluded that it had subject matter jurisdiction, but we agree with Rafidain that its activities did not have the requisite "direct effect."

*Texas Trading* is the principal decision of this circuit analyzing the "direct effect" clause of the FSIA.[2] There, we found a "direct effect in the United States" in circumstances in which New York corporations had sustained losses when the government of Nigeria prevented Morgan Guaranty Trust Company from making payments due and payable in New York City under a contract between Nigeria and the corporations. Morgan's role was to examine documents to be presented by the corporations before payment, but it bore no independent liability to the corporations for failure to pay.

The foundations of IHL's claim of subject matter jurisdiction are, first, alleged harm to IHL in the United States, and, second, Royal Bank's payment of the overdraft guarantees into Rafidain's Irving Trust account at Rafidain's specific direction. These factors, even when viewed together, are not sufficient.

■ With regard to harm to IHL in the United States, IHL is not a United States corporation. To be sure, foreign corporations may bring suit in the United States under the FSIA. *See* 712 F.Supp. at 1117; *see also Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490–91, 103 S.Ct. 1962, 1969–70, 76 L.Ed.2d 81 (1983). Nevertheless, the fact that IHL is a foreign corporation is relevant to whether the financial losses to IHL constituted a "direct effect" in the United States. We believe they did not. The various contracts did not provide for payment in the United States, and the use of American personnel and equipment by IHL in Iraq seems to us to be so incidental to the interests of the United States as to be irrelevant. The fact that some or all of IHL's principals or officers may be United States citizens does not outweigh the facts that they organized the company outside the United States and that its losses in the instant transaction thus occurred elsewhere. For these reasons, we agree with the district court that there was no direct financial loss to IHL in the United States. *See* 712 F.Supp. at 1116 n. 7.[3]

---

**2.** We opined in a footnote that courts construing the "direct effect" clause are not bound by legislative history suggesting that the effect must be both "substantial" and "foreseeable." 647 F.2d at 311 n. 32; *see also Martin v. Republic of South Africa,* 836 F.2d 91, 94 (2d Cir.1987) ("reaffirming" *Texas Trading* view that "courts construing the 'direct effect' clause should not be constrained to follow the 'substantial' and 'foreseeable' factors"). This view has been rejected by the Fifth, Sixth, Seventh, Ninth and D.C. Circuits, all of which explicitly apply a "substantial and foreseeable effects" standard. *See America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 798–99 (9th Cir.1989) (describing circuit split and holding that "foreign sovereign's activities must cause an effect in the United States that is substantial and foreseeable in order to abrogate sovereign immunity"); *see also Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic,* 877 F.2d 574, 581 (7th Cir.) (effects of foreign state's conduct may not be "purely fortuitous" but must be "substantial" and "direct and foreseeable" to support FSIA jurisdiction), *cert. denied,* — U.S. —, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989); *Gould, Inc. v.*

*Pechiney Ugine Kuhlmann,* 853 F.2d 445, 453 (6th Cir.1988) (same); *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1514 (D.C.Cir. 1988) (same); *Zernicek v. Brown & Root, Inc.,* 826 F.2d 415, 417–18 (5th Cir.1987) (same), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988); *cf. Harris Corp. v. National Iranian Radio & Television,* 691 F.2d 1344, 1351 (11th Cir.1982) (citing *Texas Trading,* but applying substantial and foreseeable consequences test). We believe this apparent difference between other circuits and us does not affect the outcome in this case because the effect here is neither "direct" nor "substantial" and "foreseeable."

**3.** We therefore need not address the question of whether financial loss in the United States would by itself be sufficient for FSIA jurisdiction. *See Gregorian v. Izvestia,* 871 F.2d 1515, 1527 (9th Cir.) ("[M]ere financial loss suffered by a plaintiff in the United States as a result of the action abroad of a foreign state does not constitute a 'direct effect' and therefore cannot by itself create subject matter jurisdiction under section 1605(a)(2)."), *cert. denied,* — U.S. —,

■ The payments by Royal Bank into the Irving Trust account upon directions by Rafidain are also not a sufficiently "direct effect in the United States" to support FSIA jurisdiction. The benefit to Rafidain from such payments was at its situs in Iraq.[4] Payment in New York City was not a contractual requirement under Royal Bank's guarantees. *See* 712 F.Supp. at 1119. By directing payment into the Irving Trust account, Rafidain availed itself of the protection only of the usual banking laws, but not of any United States law relevant to its contract with IHL or to its allegedly fraudulent and untimely demands upon Royal Bank. Irving Trust's role, moreover, was that of a passive conduit indifferent to the nature or terms of the underlying transaction. Thus, although we are mindful of "Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign," *Texas Trading*, 647 F.2d at 312, we conclude that the United States does not have an interest in this action such that "Congress would have wanted an American court to hear the case," *id.* at 313.

In contrast, *Texas Trading* involved New York corporations seeking to enforce a contract that provided for payment by Morgan Guaranty Trust in New York City. Both the financial loss and the breach thus occurred in the United States. Morgan, moreover, was an active participant. Although it bore no direct liability to the New York corporations, it was obligated by Nigeria to examine the requisite documentation before paying, and, after receiving instructions from Nigeria not to pay even if the proper documents were presented, Morgan played an active role as an intermediary between Nigeria and the corporations. In the instant case, Irving Trust merely recorded a deposit in Rafidain's account.

Because we conclude that there is no subject matter jurisdiction, we need not address appellant's arguments regarding personal jurisdiction.

The cross-appeal is reversed; the appeal is dismissed as moot.

KAUFMAN, Circuit Judge (dissenting):

I would affirm Judge Ward's decision finding subject matter jurisdiction under the Foreign Sovereign Immunities Act but dismissing the action for lack of personal jurisdiction.

We have noted on a previous occasion that a determination of "direct effects" sufficient to sustain subject matter jurisdiction under the exception to immunity codified in 28 U.S.C. § 1605(a)(2) "is an enterprise fraught with artifice." *Texas Trading & Milling Corp.*, 647 F.2d 300, 312 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). We have ruled since in a number of instances involving the repudiation of debts payable in the United States. This is the first case, however, involving a direct transfer of funds into the United States. In my view, the payments of over $221,000 by Royal Bank of Canada into Rafidain's New York ac-

---

110 S.Ct. 237, 107 L.Ed.2d 188 (1989); *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d at 1515 (financial loss in United States must be accompanied by "something legally significant" that happened in the United States for FSIA jurisdiction to attach). An injury to a corporation occurs in some legally significant situs, for instance, the place of incorporation, *see Crimson Semiconductor, Inc. v. Electronum*, 629 F.Supp. 903, 907 (S.D.N.Y.1986) (finding direct effect where New York corporation suffers loss); *Exchange Nat'l Bank of Chicago v. Empresa Minera del Centro del Peru, S.A.*, 595 F.Supp. 502, 505 (S.D.N.Y.1984) (same), or a place designated for performance of a contract, *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 121–22 (S.D.N.Y.1988) (finding direct effect in the United States where foreign sovereign repudiated debt to foreign corporation where contract specified that debt was to be paid in the United States). *See also Texas Trading*, 647 F.2d at 312 (finding direct effect in the United States where contract called for collection of money in the United States and plaintiffs were American corporations); *cf. Martin v. Republic of South Africa*, 836 F.2d 91 (2d Cir. 1987) (continued suffering and damages of United States resident from personal injury sustained in foreign state do not constitute "direct effect in the United States" for FSIA jurisdiction).

4. The question of whether payment to a United States branch office of a foreign sovereign's bank would involve a "direct effect in the United States" is not before us.

count at Irving Trust at the direction of Rafidain constitute a "direct effect in the United States."

Rafidain, a bank wholly owned by the government of Iraq, maintains a "correspondent" bank account with the Irving Trust Company in New York City as a means of "expedit[ing] the international transfer of funds, principally in United States dollars."[1] It is inconceivable that the receipt of payment by Irving Trust did not have a direct effect on it as a financial institution and, arguably, on New York as "the international clearing center for United States dollars." *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 521 (2d Cir.1985), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). At a minimum, the receipt of funds had a direct effect on the New York bank's ability to make payments and transfer funds on Rafidain's behalf, without posing some risk to its own economic well-being.

While the maintenance of a United States correspondent bank account and receipt of payment into that account may not constitute sufficient contacts with a forum to confer personal jurisdiction or to provide the basis for utilizing our laws in a dispute, they provide a sufficient nexus to the United States to support an assertion of subject matter jurisdiction over a related controversy.

Furthermore, I have difficulty reconciling the result reached by the majority with the emerging trend in the district courts to find that nonpayment of a debt payable in the United States between foreigners causes a direct effect in the United States. *See, e.g., L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114 (S.D.N.Y.1988) (nonpayment of a debt payable in the United States by a foreigner to a foreigner causes a direct effect in the United States); *Jerushan Corp. v. Banco Mexico Somex, S.A.,* No. 83 Civ. 2431, 1986 WL 1795 (S.D.N.Y. Feb. 6, 1986) (LEXIS, Genfed library, Dist. file) (nonpayment of certificates of deposit issued by Mexican bank to Mexican citizens had direct effect in the United States, "[e]ven if the contrac-

tual language is construed to require plaintiffs to obtain payment in Mexico."); *Italian International Bank v. Banco Industrial de Venezuela C.A.,* No. 80 Civ. 5288, 1984 WL 438 (S.D.N.Y. June 6, 1984) (WESTLAW, DCT Database) (nonpayment of certificate of deposit payable in the United States between foreign banks had direct effect in the United States). If nonpayment between alien entities has a direct effect here, then surely it follows that payment does too.

The majority appears to accept Rafidain's argument that these recent cases are distinguishable because they involve a United States branch or agency office or a contract payable in the United States. In my view, these distinctions have not been determinative but indicate that absent payment, some other connection with the United States is necessary. In the typical breach of deposit case, the role of the branch or agency was merely to accept deposits passively, essentially the same function performed by Irving Trust in the instant "receipt of payments" case. *But cf., Italian International,* No. 80 Civ. 5288 ("[A] most important factor here is the substantial role played by [the foreign bank's] New York agency in connection with the transaction sued on."). While the written contract between IHL and Rafidain did not provide for payment in dollars in the United States, the contract proved equally "payable in the United States" when Royal Bank complied with Rafidain's demands that it credit its account at Irving Trust.

While I am mindful that allowing jurisdiction whenever credits are directed through American banks might cause foreign states to divert business from the United States to banks in foreign lands, *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1298 (S.D.N.Y.1980), *aff'd on other grounds,* 647 F.2d 320 (1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), I believe this policy concern is better addressed in the context of personal jurisdiction. In *Texas Trading,* we identified as

---

**1.** Affidavit of Charles J. Dugan, Vice–President and lending officer of Irving Trust.

one factor in determining minimum contacts for purposes of personal jurisdiction "the countervailing interest of the United States in hearing the suit." 647 F.2d at 314.

I agree with Judge Ward, 712 F.Supp. 1112 (S.D.N.Y.1898), for the reasons set forth in his opinion.